NO. 07-02-0532-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

MARCH 23, 2004

_____


JASON BAUM TREVINO, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 69TH DISTRICT COURT OF MOORE COUNTY;

NO. 3106; HONORABLE RON ENNS, JUDGE

_____

Before JOHNSON, C.J., and REAVIS and CAMPBELL, JJ.

**MEMORANDUM OPINION**

After appellant Jason Baum Trevino pleaded not guilty, a jury convicted him of Murder and assessed as punishment twenty-five years confinement. Asserting one issue, appellant complains the evidence is factually insufficient to establish beyond a reasonable doubt that he did not act in self-defense. We affirm.

On June 12, 2001, a group of friends gathered at the victim Freddie Torres's apartment. The group, which included the victim, Ezekiel Almanza, Nathaniel Godinez, and appellant, drank beer and watched television. Appellant, who turned 18 in April, had been living with the victim for the past two months. At some point in the evening, Godinez and appellant, who were, by all accounts, intoxicated, got into a fist fight outside the front door of the victim's apartment. The fight moved inside the apartment for a short time, then returned to the front porch where the victim and Almanza separated appellant and Godinez. Not long after, appellant and Godinez became embroiled once more, and the victim left his apartment and "told [appellant] to get inside in five minutes" or he was going to lock him out of the apartment. Apparently, appellant thought the victim said he was going to knock appellant out if he did not return to the apartment. After appellant retorted he did not care whether he was locked out, the victim and Almanza returned to the apartment.

Angered by the victim's perceived threat, appellant began to knock on the front door of the apartment. When Almanza let appellant into the apartment, appellant approached the victim and punched him. A fight ensued and resulted in the victim pinning appellant down on the couch and ordering him out of the apartment for the night. After the victim released him, appellant laid for a moment on the couch and drolly remarked, "I didn't think you could beat my ass." Appellant then ran out of the apartment. It was then that Almanza noticed the victim had blood on his knuckles and was complaining of some pain in his

chest from being kicked there by appellant. The victim placed a bag of frozen vegetables on his knuckles to relieve the pain.

A short while later, a mutual friend of appellant's and the victim's called to request permission for appellant to return and retrieve his belongings from the apartment. After the phone call, the victim and Almanza watched television for a while before deciding to go to bed. About that time, the two heard someone banging on the door, followed by appellant yelling, "It's me, motherf-----. Open up." The victim opened the door, and appellant, who was accompanied by his girlfriend Jessica Hernandez, remarked he was "just here to get [his] clothes." However, as soon as appellant walked into the apartment, he started throwing punches at the victim. The two became engaged in a violent altercation, and eventually landed on the couch in the living room, with appellant on top of the victim. When appellant stood up, Almanza noticed blood on the right side of the victim's neck and back and on appellant's left hand. The victim then rushed toward appellant, who placed him in a headlock. It was at that point that Almanza and Hernandez observed a knife in appellant's left hand. After ordering Hernandez to call 911, Almanza, who was standing on appellant's left side, retrieved the knife from appellant and placed it on top of the television. Appellant and Hernandez then left the apartment, and Almanza called 911.

When he arrived at the apartment, Larry Dutcher, a captain with the Dumas Fire Department, found the victim lying in the hallway in a pool of blood. Though the victim had a faint pulse at the time Dutcher arrived, neither he nor the paramedics who responded to

3

the scene three or four minutes later could revive him. Robert Lyon, the forensic pathologist who conducted the victim's autopsy, determined the cause of death to be "stab wounds to the neck and torso."

On June 13, 2001, appellant turned himself in to police, who charged him with the victim's murder. At trial, the State called, among others, the witnesses detailed above. In response, appellant's theory was that he had committed the offense in self-defense. To that end, appellant cross-examined Amanda Mendoza, the victim's girlfriend, about a telephone conversation she had with the victim between his and appellant's first and second fights. According to Mendoza, the victim told her that "he had kicked [appellant's] ass," and he was running his knuckles under cold water because they were bruised and hurting. Mendoza volunteered, however, that the victim complained of his head hurting where appellant had kicked him. Appellant also cross-examined Hernandez who averred that it was the victim who threw the first punch during appellant's second altercation with him. Hernandez further recollected that, at one point during the confrontation, the victim pinned appellant against the wall in a "choke-like position." Earlier in her testimony, however, Hernandez admitted that after appellant cleaned up at his mother's house, he was not really injured. Finally, appellant, while cross-examining Tom Flood, the investigator assigned to handle the case, elicited testimony regarding the victim's possible ties to the Latin Kings, a "violent type group." According to Flood, the victim had "Latin Kings" tattooed on his body, and he had in his apartment a calendar that had a "representation regarding Latin King" on it.

During his case-in-chief, appellant called Godinez to testify about his recollection of the first altercation between appellant and the victim. Initially, Godinez admitted that he and appellant had been drinking throughout the evening of June 12, 2001, and that they were "highly intoxicated." He then testified that, although he did not see the beginning of the altercation, he did walk into the victim's apartment in time to see appellant laying on the couch and the victim standing over him. Godinez also told the jury that when appellant arrived at his house to spend the night, "he [appellant] didn't look like anything happened." During cross-examination by the State, however, Godinez indicated that appellant had bruises on his forehead and a fat lip. Furthermore, Godinez averred appellant told him that "he went back [to the victim's apartment] for his stuff and that he stabbed him [the victim]." Godinez also told the jury that appellant acted careless and more aggressive and liked to fight when he was drunk. Before resting his case, appellant offered, and the trial court admitted, into evidence a certified copy of a record of conviction indicating the victim was convicted of aggravated battery and robbery in Cooke County, Illinois in 1993.

By his sole issue, appellant contends the "evidence at trial was factually insufficient to support the jury's verdict of guilty as charged in the indictment thus rejecting [his] claim of self defense and, as such, [he] should received a new trial." We disagree. In raising a justification of self-defense, a defendant bears the burden of production, which requires the production of some evidence that supports the particular defense. Zuliani v. State, 97 S.W.3d 589, 594 (Tex.Cr.App. 2003). Once the defendant produces such evidence, the State then bears the burden of persuasion to disprove the raised defense beyond a

5

reasonable doubt. *Id.* The burden of persuasion does not require the production of evidence, but rather only requires that the State persuade the jury beyond a reasonable doubt that the defendant did not act in self-defense. *Id.* A jury verdict of guilty results in an implicit finding against the defensive theory. *Id.*

When a defendant challenges the factual sufficiency of the rejection of a defense, we must review all of the evidence in a neutral light and ask whether the State's evidence taken alone is too weak to support the finding and whether the proof of guilt, although adequate if taken alone, is against the great weight and preponderance of the evidence. *Id.* at 595. The jury is the sole judge of the facts, the witnesses' credibility, and the weight to be given to the evidence. Johnson v. State, 23 S.W.3d 1, 7 (Tex.Cr.App. 2000). Thus, the jury may choose to believe or not to believe any portion of the witnesses's testimony. Sharp v. State, 707 S.W.2d 611, 614 (Tex.Cr.App. 1986). In conducting our analysis, we must defer to the trier of fact's determination concerning the weight given contradictory evidence. *See* Cain v. State, 958 S.W.2d 404, 407 (Tex.Cr.App. 1997).

Regarding the statutory law applicable to this case, we note that a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of force. Tex. Pen. Code Ann. § 9.31(a) (Vernon 2003). Reasonable belief means a belief that would be held by an ordinary and prudent man in the same circumstances as the actor. *Id.* § 1.07(42) (Vernon Supp. 2004). Actual danger is not required; rather, as long

6

as a defendant's belief is reasonable, he is entitled to use force to protect against an apparent danger.  Jones v. State, 544 S.W.2d 139, 142 (Tex.Cr.App. 1976).  The use of force against another is not justified, however, if the actor provoked the other's use or attempted use of unlawful force, unless (1) the actor abandons the encounter, or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the encounter; and (2) the other nevertheless continues or attempts to use unlawful force against the actor.  Tex. Pen. Code Ann. § 9.31(b) (4) (Vernon 2003).

Deadly force is a force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury.  *Id*. § 9.01 (3).  Serious bodily injury means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss of impairment of the function of any bodily member or organ.  *Id*. § 1.07(46) (Vernon Supp. 2004).  A person is justified in using deadly force against another: (1) if he would be justified in using force against the other under section 9.31; (2) if a reasonable person in the actor's situation would not have retreated; and (3) when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force, or to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.  *Id*. § 9.32(a) (Vernon 2003).  If the defendant reasonably believes the use of deadly force, when and to the degree used, is immediately necessary for protection, he may use deadly force even if, as a factual matter, he is not in actual danger.  *Jones*,

7

544 S.W.2d at 142. Deadly force, however, is not immediately necessary if a reasonable person in the position of the defendant would use some available nondeadly method of self-defense. Kelley v. State, 968 S.W2d 395, 399 (Tex.App.–Tyler 1998, no pet.).

When a defendant claims self-defense in a murder case, he may present evidence of the victim's aggressive or violent character to support the claim. *See* Tex. R. Evid. 404 (a)(2). The character traits may be proven through either reputation or opinion evidence or specific instances of conduct. *Id.* at 405. Specific acts evidence must be known to the defendant if they are used to show a reasonable apprehension of danger, but if they are used to show that the victim was the aggressor, the defendant need not have had knowledge of those acts. Beecham v. State, 580 S.W.2d 588, 590 (Tex.Cr.App. 1979). Here, appellant maintains he had reason to fear the infliction of serious bodily injury by the victim because of the previous altercation between them and because of the victim's prior convictions for aggravated battery and robbery. He claims the same facts conclusively establish that the victim was the ultimate aggressor.

The relevant inquiry, then, is whether sufficient evidence exists to support the jury's conclusion appellant could not have reasonably believed deadly force was immediately necessary to protect himself against the victim's use or attempted use of unlawful deadly force. At the outset, we note there was conflicting evidence regarding appellant's alleged fear of the victim inflicting upon him serious bodily injury. For instance, although Godinez claimed appellant suffered a bruised forehead and fat lip after his first altercation with

appellant, Almanza observed no injuries to appellant. Next, Almanza testified that appellant threw the first punch during the second fight with the victim, while Hernandez fingered the victim as the first aggressor. And, although the victim bested appellant during their first altercation, according to Almanza appellant laughed about the victim's physical prowess. Moreover, appellant returned to the victim's apartment only a short while after the first dispute and began banging on the door and shouting profanities in an effort to convince the victim to allow him inside. In addition, there is no evidence to suggest the victim ever possessed a deadly weapon during either confrontation with appellant. Neither does the record reveal whether appellant was aware of the victim's prior convictions for aggravated battery and robbery. From the preceding facts, then, the jury, as fact finder, was free to reject appellant's claim that he reasonably believed the victim was about to inflict serious bodily injury upon him. *See* Saxton v. State, 804 S.W.2d 910, 913-14 (Tex.Cr.App. 1991) (the credibility of appellant's defensive evidence is within the sole province of the jury, which is free to accept or reject that evidence). The jury was also entitled to deduce that it was appellant who was the ultimate aggressor in the final dispute, not the victim. Moreover, a rational jury could have concluded that appellant was not authorized to use deadly force because he failed to retreat when a reasonable person in his position would have done so. Finally, the jury was free to find that appellant exceeded the amount of force he was authorized to use under the circumstances. Thus, the evidence of guilt is not so weak as to render the verdict clearly wrong or manifestly unjust. Nor is the finding of guilt so contrary to the great weight and preponderance of the

9

evidence as to be clearly wrong.  In short, the evidence is factually sufficient to support the verdict.  Appellant's sole issue is overruled.

Accordingly, the judgment of the trial court is affirmed.


Don H. Reavis
Justice

Do not publish.